(CLOSED)

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

—————————————————— :
:
STEPHEN J. HOPKINS,                 :
:
              Plaintiff,            :        CIVIL ACTION NO.: 02-5589 (JCL)
:
       v.                           :        **OPINION**
:
DENNIS J. DUCKETT, MICHAEL          :
R. D'APPOLONIA, KEVIN I.            :
DOWD, HOWARD S. HOFFMANN, :
and NIGHTINGALE & ASSOCS.,          :
LLC.                                :
              Defendants/Third      :
              Party Plaintiffs,     :
:
       v.                           :
:
STEPHEN HOPKINS                     :
ASSOCIATES, INC.                    :
:
              Third Party           :
              Defendant.            :
—————————————————— :

## LIFLAND, District Judge

This matter is before the Court on Defendants' motions to dismiss, and

motions for summary judgment on, Plaintiff Stephen J. Hopkins's ("Hopkins" or

"Plaintiff") various New Jersey statutory and common law claims, and his claim

under the Employee Retirement Income Security Act ("ERISA"). For the reasons that follow, the Court will grant Defendants' motion for summary judgment on Hopkins's ERISA claim. Because there are no remaining claims in this case over which the Court has original federal subject-matter jurisdiction, the Court declines to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3), and will dismiss, without prejudice, the remainder of Plaintiff's complaint, and Defendants' counterclaims and Third Party Complaint.

## I.   <u>Background</u>

Except where noted, the following facts are undisputed. Hopkins is a former member and shareholder of Defendant Nightingale & Associates ("Nightingale" or "the LLC"), a Delaware limited liability company ("LLC") with its principal place of business in Connecticut. Nightingale is a turnaround management consulting firm; it advises financially troubled businesses, their creditors, and insurance companies. The individually named Defendants, Dennis J. Duckett ("Duckett"), Michael R. D'Appolonia ("D'Appolonia"), Kevin I. Dowd ("Dowd"), and Howard S. Hoffmann ("Hoffmann"), are members and shareholders of Nightingale.

Nightingale became an LLC in 1997. At that time Hopkins, through his own closely-held corporation, Stephen Hopkins Associates, Inc. ("SHA"), served

2

as Nightingale's managing member, and owned a 25% share of the LLC.[1] Hopkins provided consulting services to Nightingale as an independent contractor pursuant to a Services Agreement between SHA and Nightingale.  The Services Agreement delineates the terms and conditions of Hopkins's work for the LLC.

On May 14, 2001, Nightingale's members, including Hopkins, unanimously voted to amend the LLC's operating agreement ("the Amended Operating Agreement").  Among other changes, the amendments reduced Hopkins's share of Nightingale to 15%, and reduced the number of votes required for a major business decision to 60% of Nightingale's shares.  Thus, Hopkins no longer retained a blocking vote.  He also relinquished his role as managing member.

Hopkins claims that his approval of the Amended Operating Agreement was conditioned upon Defendants' agreement to, and performance of, the terms of a Retirement Agreement he negotiated with Defendants the previous fall.  The terms of the agreed-upon Retirement Agreement entitled him to year-end distributions from Nightingale for two years following his anticipated retirement on December 31, 2002–a retirement date that Defendants agreed to be "flexible" with, "both earlier and later."  (Second Amend. Compl., Ex. C.)  Hopkins claims that

---

[1] Hopkins's 25% share gave him a "blocking vote" over Nightingale's major business decisions, which under the then-applicable LLC operating agreement required a vote in excess of 75% of Nightingale's shares.

Defendants also agreed to continue giving him certain responsibilities at Nightingale both before and after his retirement.

Hopkins asserts that he was not given the responsibilities he was promised. Due to his fear of being excluded from Nightingale's work after retirement, and due to his improved health and changed financial situation, Hopkins informed Defendants in September 2002 that he no longer intended to retire on December 31, 2002. Defendants then allegedly attempted to pressure Hopkins into retiring by telling him he was too old to continue with the LLC, and by threatening to change the Amended Operating Agreement in order to make it easier to remove Hopkins without cause, and easier to decrease a removed member's entitlement to distributions. Hopkins persisted in his refusal, and the Amended Operating Agreement was in fact amended as threatened at a September 30, 2002 meeting over Hopkins's dissenting vote ("Second Amended Operating Agreement"). Under the new amendments, six of Nightingale's eight members, including Duckett, D'Appolonia, Dowd, and Hoffmann, voted on November 15, 2002 to give notice to Hopkins of their intention to vote on his removal as a member. Their stated reasons were their lack of confidence in Hopkins's work, the disruption caused by the parties' strained relations, and Hopkins's failure to retire.

Hopkins initiated this suit on November 22, 2002. His 12-count Second

Amended Complaint asserts claims under the New Jersey Oppressed Minority

Shareholder Statute, N.J.S.A. § 14A:12-7, under the New Jersey Law Against

Discrimination, N.J.S.A. § 10:5-12, various breach of contract claims, fraud,

retaliation, conversion, breach of fiduciary duty, and an ERISA claim.  By motion

for preliminary injunction, Hopkins sought to bar the Defendants from removing

him and to have the Court appoint a custodian to manage Nightingale's affairs.

Hopkins's motions were denied.  On October 31, 2003 the members of

Nightingale voted to remove Hopkins as a member.  (Second Amend. Compl. ¶

86.)  His membership interest was purchased and presently is being held in

escrow.

On February 26, 2003, Defendants filed counterclaims against Hopkins, and

a Third Party Complaint against SHA, asserting various state law breach of

contract and fiduciary duty claims.  Defendants now move to dismiss Hopkins's

claims, and for summary judgment.  Hopkins responded with a cross-motion to

dismiss the counterclaim and Third Party Complaint.

## II.   Discussion

### A.   Hopkins's ERISA Claim

Hopkins claims that by virtue of the Retirement Agreement, Defendants

owed him a fiduciary duty under ERISA, and breached that duty by allegedly

demanding that he either retire by December 31, 2002 or face removal from
Nightingale.  Defendants move for summary judgment on this claim.

### i.   <u>Standard of Review</u>

Summary judgment is a procedural tool that obviates the need for trial by
identifying and disposing of groundless claims and defenses.  <u>See</u> <u>Celotex Corp. v.</u>
<u>Catrett</u>, 477 U.S. 317, 323-24 (1986).  Relief is warranted where "the pleadings,
depositions, answers to interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any material fact and
that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P.
56(c).

### ii.   <u>ERISA's "Employee" Requirement</u>

ERISA is a "comprehensive statute for the regulation of employee benefit
plans."  <u>Aetna Health Inc. v. Davila</u>, 542 U.S. 200, 208 (2004).  An employer
offering an ERISA benefit plan owes fiduciary duties to the plan's "participants,"
and is bound by an objective standard of care.  29 U.S.C. §§ 1104(a)(1)(A) and
(B).  ERISA permits a "participant" to bring a civil action for equitable relief to
enforce ERISA's substantive provisions.  <u>Id.</u> § 1132(a).  The statute defines
"participant" as "any employee or former employee of an employer . . . who is or
may become eligible to receive a benefit of any type from an employee benefit

plan . . . ." Id. § 1002(7).  "[E]mployee" is defined as "any individual employed by an employer." Id. § 1002(6).  Recognizing that this definition is "completely circular," the United States Supreme Court, in Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323 (1992), adopted the general common-law agency test for determining who qualifies as an ERISA "employee."  That test hinges on "the hiring party's right to control the manner and means by which the [work] product is accomplished." Id.  When performing this inquiry, a court must look to a number of relevant factors, including

> "the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party."

Id. at 323-24 (quoting Community for Creative Non-Violence v. Reid, 490 U.S. 730, 751-52 (1989)).  This list is nonexhaustive, and no one factor is determinative. Id. at 324.

Applying this test, two United States Courts of Appeals have found that plaintiffs similarly situated to Hopkins are not "employees."  In Barnhart v. New York Life Ins. Co., 141 F.3d 1310, 1312-13 (9th Cir. 1998), the Ninth Circuit

7

affirmed a district court's dismissal, on summary judgment, of an insurance

agent's ERISA claim against an insurance company.  The Court found that the

plaintiff (1) signed a contract with the defendant "contain[ing] clear language

stating that [the plaintiff] would be considered an independent contractor, not an

employee"; (2) was free to dictate his day-to-day operations; (3) was paid on a

commission basis; (4) filed tax returns indicating his income was from self-

employment; and (5) was free to work for the defendant's competitors.  Id.  These

factors demonstrated that the plaintiff was not an "employee," the Court explained,

despite the existence of other factors weighing in favor of "employee" status,

namely: (1) the defendant offered the plaintiff benefits such as a pension, 401(k)

plan, and life insurance; (2) the plaintiff worked for the defendant for 16 years; (3)

the defendant had the right to terminate the plaintiff's contract at will; and (4) the

defendant provided training to the plaintiff.  Id. at 1313.

Similarly, the First Circuit, in Speen v. Crown Clothing Corp., 102 F.3d

625, 633-34 (1st Cir. 1996), upheld a district court's grant of judgment as a matter

law dismissing a men's clothing salesman's ERISA claim on the ground that he

was not an "employee"of the defendant clothing manufacturer.  The evidence

demonstrated that the plaintiff (1) had an understanding with the defendant that he

would not be treated as an employee; (2) formed his own corporation, of which he

was an employee, and through which received he received commission checks

from the defendant; (3) was not enlisted in the defendant's retirement pension

plan; (4) dictated his own daily schedule and hours; (5) was not required to report

to the defendant's place of business on a daily basis; (6) had the freedom to

control the manner in which he sold the defendant's goods; (7) was paid on a

commission basis; and (8) received a Form 1099 for federal tax purposes, rather

than a W-2.[2]

In this case, it is undisputed that Hopkins had a relationship with

Nightingale that is nearly identical to those described above.  First, Hopkins was

an employee of his own corporation, SHA, which, through the Services

Agreement, contracted Hopkins's consulting services to Nightingale explicitly as

"an independent contractor."  (Hoffman Decl., Ex. D, ¶ 5; Defs.' Statement of

Undisputed Material Facts ¶¶ 2-3; Pl.'s Statement of Undisputed and Disputed

Material Facts p. 15, ¶¶ 2-3.)  Thus, it was the parties' understanding that Hopkins

was an independent contractor, not an employee.

---

[2] According to the Internal Revenue Service, a Form 1099 is used by independent contractors to report income to the federal government.  The form is issued by an employer to a worker when the "payer has determined that an employer-employee relationship does not exist in [the recipient's] case."  Internal Revenue Service, United States Department of the Treasury, at http://www.irs.gov/faqs/faq4-3.html (last visited Nov. 17, 2006).

Second, under the Services Agreement, Hopkins had nearly unfettered control over the performance of his services. Hopkins had "the right to control . . . the manner of the performance of the services to be provided," and "discretion as to the time and location the consulting services [were] to be provided." (Hoffman Decl., Ex. D ¶¶ 3, 5.) Indeed, Hopkins performed a "substantial amount" of his work from his own home office in New Jersey, not from Nightingale's Connecticut headquarters. (Hopkins Cert. ¶¶ 2-3.) Furthermore, although the Services Agreement required Hopkins to work at least 150 days per year, Nightingale could not require Hopkins to perform "any specific minimum amount of services." (Hoffman Decl., Ex. D ¶ 3.) Nor could Nightingale prevent Hopkins from performing services for other companies. (Id.)

Third, Hopkins was not subject to at-will termination by Nightingale; the Services Agreement was a one-year contract that automatically renewed at the end of each year. (Hoffman Decl., Ex. D ¶ 2.) Fourth, Nightingale compensated SHA, not Hopkins, for Hopkins's services. (Hoffmann Decl., Ex. D ¶ 4.) Fifth, Nightingale used a Form 1099, not a W-2, to report amounts it paid, through SHA, to Hopkins. Thus, Nightingale did not take income tax deductions for these payments, and Hopkins was responsible for reporting his income and paying all applicable taxes on his compensation. (Hoffman Decl., ¶ 55, and Ex. D ¶ 5; Sirot

Decl., Ex. 13.)  Sixth, Nightingale does not contribute to any type of pension plan, retirement plan or unemployment insurance.  (Sirot Decl., Exs. 13, 16.)  Finally, bolstering these strong indicia that Hopkins was not an "employee," are Hopkins's repeated admissions in deposition testimony that he was only an independent contractor for Nightingale.  (See, e.g., Sirot Decl., Ex. 10, 38:10-19, 41:7-13.)

Despite this evidence and despite his own admissions, Hopkins insists that he was a "de facto" employee.  He attempts to explain away the Services Agreement's "independent contractor" designation as being only "for tax and liability purposes," and claims that he can still "be an employee for [ERISA] purposes."  (See Pl.'s Statement of Undisputed and Disputed Material Facts, at p. 15 ¶ 3.)  This is simply incorrect.  First, the Darden Court explicitly said that the "tax treatment of the hired party" is a factor in the ERISA "employee" inquiry. See Darden, 503 U.S. at 324.  Second, Hopkins cannot be a non-employee for liability purposes while being an employee for ERISA purposes.  The test for whether an employer is liable for the actions of its employee under the doctrine of respondeat superior is identical to the test for whether an employer can be sued by an employee under ERISA.  Compare Darden, 503 U.S. at 322-23 (explaining that in an ERISA suit a "conventional master-servant relationship as understood by common-law agency doctrine" must exist between the parties), with General Bldg.

11

Contractors Ass'n v. Pa., 458 U.S. 375, 392 (1982) (explaining that the common law doctrine of *respondeat superior* "enables the imposition of liability . . . on the master for the wrongful acts of his servant," and that "[a] master-servant relationship is a form of agency in which the master," inter alia, "controls or has the right to control the physical conduct of the other in the performance of the service") (internal quotations and citations omitted).  Therefore, Hopkins and Nightingale's explicit disavowal of an employer-employee relationship in the Services Agreement for tax and liability purposes strongly indicates that Hopkins was also not an employee for ERISA purposes.

Next, Hopkins claims that he was an "employee" because Nightingale could, and did, exercise some measure of control over his work by failing to give him job assignments.  This type of "control," however, can be exercised over any independent contractor, and in any event is not the type of control determinative of whether one is an "employee."  As Darden explained, under traditional agency law principles, whether an employer-employee relationship exists depends on the extent of "the hiring party's right to *control the manner and means by which the [work] product is accomplished*."  503 U.S. at 323-24 (emphasis added).  This necessarily measures control over work that has already been delegated.  Work can be denied in the first place to both employees and independent contractors.  The

fact remains that once Hopkins received a project, he–not Nightingale–had boundless control over the manner, means, duration, and location of his work on that project.

Hopkins also points out that Nightingale paid him at an "hourly rate."  (See Hoffmann Decl., Ex. D ¶ 4.)  However, Hopkins's receipt of compensation at this hourly rate was not guaranteed, but instead conditioned upon a client's payment of fees to Nightingale first, much like a commission.  (See Sirot Decl., Ex. 10, p. 38:10-41:6.)  Hopkins, through SHA, billed Nightingale at a pre-determined hourly rate, which Nightingale paid out of the fees it charged to, and received from clients for Hopkins's services.  If a client failed to pay Nightingale, Hopkins received nothing for his efforts.  This structure is more akin to a commission received by an independent contractor for his successful efforts, than it is to an employee's guaranteed hourly wage for labor, and thus weighs against Hopkins's alleged employee status.[3]

Finally, Hopkins stresses that he performed work exclusively for Nightingale for a long period of time (fifteen years), that Nightingale provided a

_____

[3] Even were the Court to consider this a factor that weighed in favor of employee status, the Court's decision would still be the same.  There are simply too many other factors demonstrating that Hopkins was not an "employee" of Nightingale.

health insurance policy for him and his family, and that business cards and bills given to clients bore Nightingale's name, not his or SHA's name. Although these factors could weigh in favor of the existence of an employer-employee relationship, on the whole they are insufficient to overcome the overwhelming evidence to the contrary. The Ninth Circuit, facing similar facts, has held the same. See, e.g., Barnhart, 141 F.3d at 1313.

The undisputed material facts conclusively establish that, as a matter of law, Hopkins was not an ERISA "employee" of Nightingale. Accordingly, the Court will grant Defendants' motion for summary judgment on Plaintiff's ERISA claim.

**B.      Diversity Jurisdiction**

With the dismissal of Plaintiff's only federal claim, the Court will reexamine whether federal subject-matter jurisdiction still exists over the case.

The existence of subject-matter jurisdiction may be challenged at any time, and the issue may be raised, as it is here, by the Court *sua sponte*. See Kontrick v. Ryan, 540 U.S. 443, 455 (2004).

Hopkins pled two bases for original federal jurisdiction: Diversity jurisdiction under 28 U.S.C. § 1332, and the now-eliminated federal-question jurisdiction under 28 U.S.C. § 1331. For diversity jurisdiction to exist under § 1332 there must be complete diversity of citizenship between the parties at the

14

time of the filing of suit.  See, e.g., Werwinski v. Ford Motor Co., 286 F.3d 661, 666 (3d Cir. 2002).  Although Hopkins alleged "that there is complete diversity," in his original and amended complaints, he failed to properly assert the *citizenship*, as opposed to the residence, of the parties to the action.  (See Second Amend. Compl. ¶¶ 1-7.)  These allegations are insufficient to invoke the Court's jurisdiction when based on diversity of citizenship.  See Guerrino v. Ohio Cas. Ins. Co., 423 F.2d 419, 421 (3d Cir. 1970); Forman v. BRI Corp., 532 F. Supp. 49, 51 (E.D. Pa. 1982).  Usually in such a case, the Court would give the plaintiff a chance to remedy the defective allegations.  Here, however, it is apparent that complete diversity *could not* have existed at the time of filing, and there is nothing that Hopkins could possibly re-allege to change this fact.

Hopkins filed suit on November 22, 2002.  Defendants are four individuals and Nightingale, an LLC.  An unincorporated association, such as an LLC, is a citizen of the states of which its members are citizens, not the state in which the LLC was formed or where its principal place of business is located.  Carden v. Arkoma Assoc., 494 U.S. 185, 195-97 (1990).  At the time of filing, Hopkins was a member of Nightingale.  (See, e.g., First Amend. Compl. ¶ 10.)  Therefore, regardless of which state Hopkins was a citizen of on November 22, 2002, Nightingale, by virtue of Hopkins's own membership, was also a citizen of that

15

state.  For example, the original complaint alleges that Hopkins was a resident of New Jersey.  Assuming he was also a citizen of New Jersey, Nightingale was necessarily also a citizen of New Jersey, and as a result, was a non-diverse party. This made jurisdiction under § 1332 impossible.

Hopkins's removal as a member of Nightingale on October 31, 2003 does not change this result, even though, at that moment, Hopkins and Nightingale ceased being citizens of the same state.  The Supreme Court has held that a post-filing change in citizenship of a non-diverse party does not cure a time-of-filing jurisdictional defect.  Grupo Dataflux v. Atlas Global Group, 541 U.S. 567, 574-75 (2004).  In Grupo, a Mexican corporation brought a diversity action against a limited partnership, which at that time had two Mexican-citizen partners.  Id. at 568-69.  Because a limited partnership, like an LLC, is a citizen of each state or foreign country of which its partners are citizens, the parties were not completely diverse when the suit was filed.  See id. at 569.  That the two Mexican-citizen partners later left the limited partnership during the pendency of the action did not cure the jurisdictional defect, the Court held, because "all challenges to subject-matter jurisdiction premised upon diversity of citizenship [must be measured] against *the state of facts that existed at the time of filing*–whether the challenge be brought shortly after filing, after the trial, or even for the first time on appeal."  Id.

at 571 (emphasis added).

Although Hopkins amended his complaint in May 2004 to reflect that he had been removed as a member of Nightingale (see Second Amend. Compl. ¶ 86), this amendment does not change the "state of facts that existed at the time of filing."[4]  An amended complaint supersedes and nullifies the original complaint, see e.g., Young v. City of Mt. Rainier, 238 F.3d 567, 572 (4th Cir. 2001), but the "time of filing" refers to the actual commencement of the suit, see Grupo, 541 U.S. at 576 (explaining that its holding rested on "the rule articulated by Chief Justice Marshall in 1829 that '[w]here there is *no change of party*, a jurisdiction depending on the condition of the party is governed by that condition, as it was *at the commencement of the suit*") (quoting Conolly v. Taylor, 27 U.S. 556, 565 (1829) (second emphasis added)).  Under the Federal Rules of Civil Procedure, "a lawsuit is commenced at a discrete moment in time: the filing of the *original* complaint in a court of competent jurisdiction."  Pritchett v. Office Depot, Inc.,

---

[4] It should be noted, however, that it is not clear that Hopkins did in fact amend his complaint a second time.  Hopkins moved for leave to file a second amended complaint on March 19, 2004, and leave was granted by Magistrate Judge Falk on May 11, 2004; however, the docket index does not reflect that Hopkins ever actually filed his second amended complaint with the clerk of the Court.  Nevertheless, both parties, in their instant motions, treat the second amended complaint as if it is operative.  Because it does not affect the outcome of the Court's decision, the Court, without deciding, will do the same solely for purposes of this motion.

420 F.3d 1090, 1094 (10th Cir. 2005) (citing Fed. R. Civ. P. 3) (emphasis added).
<u>See</u> <u>also</u> <u>Am. Nat'l Bank & Trust Co. v. Equitable Life Assur. Soc'y</u>, 406 F.3d
867, 875 (7th Cir. 2005) ("[I]t was necessary for the district court to dismiss the
original action in its entirety as it was infected with an incurable jurisdictional
defect – *amending the complaint* would not have overcome the want of complete
diversity at the commencement of the original action.") (citing <u>Grupo</u>, 541 U.S. at
567) (emphasis added).  Thus, the filing of Hopkins's Second Amended Complaint
reflecting that he and Nightingale were now diverse parties could not have cured
the lack of diversity existing at the commencement of the action.

In an exception to the time-of-filing rule, a district court may cure a
diversity jurisdiction defect by dismissing a dispensable, nondiverse party *sua
sponte* under Federal Rule of Civil Procedure 21.  <u>Grupo</u>, 541 U.S. at 572-73.
However, under Rule 19, the Court finds that Nightingale is an indispensable
party, and thus cannot be dismissed in order to preserve diversity jurisdiction.  As
a Delaware LLC, Nightingale is a distinct legal entity from its members, including
the individual defendants.  Its members have limited liability for the acts, debts
and obligations of the LLC.  <u>See</u> <u>Great Lakes Chem. Corp. v. Monsanto Co.</u>, 96 F.
Supp. 2d 376, 383 (D. Del. 2000).  Many of Hopkins's claims and Defendants'
counterclaims put at issue the very Operating Agreement which created the LLC,

18

and thus they impact the interests of Nightingale.  Other courts have found LLCs to be necessary parties under similar circumstances.  See, e.g., Trident-Allied Assocs., LLC v. Cypress Creek Assocs., LLC, 317 F. Supp. 2d 752, 754-56 (E.D. Mich. 2004); Trademark Retail, Inc. v. Apple Glen Investors, LP, 196 F.R.D. 535 (N.D. Ind. 2000).  Thus, Nightingale cannot be dropped from the action.  Because Nightingale was nondiverse from Hopkins at the filing of suit, diversity jurisdiction does not exist.

## C.   Supplemental Jurisdiction

Because the Court has dismissed Hopkins's only federal claim, and diversity did not exist, original jurisdiction no longer exists over this action.  Where a "district court has dismissed all claims over which it has original jurisdiction," it "may decline to exercise supplemental jurisdiction over [remaining state] claim[s]."  28 U.S.C. § 1367(c)(3).  This is an administrative decision that "is left to the sound discretion of the district court."  Annulli v. Panikkar, 200 F.3d 189, 202-03 (3d Cir. 1999) (affirming district court's dismissal of state claims under § 1367(c)(3) despite being on the "eve of trial" following "two years of litigation, fifteen pages of court docket, 1,800 pages of deposition testimony, and 2,800 pages of discovery documents").  In determining whether a district court has abused its discretion by declining jurisdiction under § 1367(c)(3), the Third

Circuit looks to whether the dismissal "serves the principles of judicial economy, convenience, fairness, and comity." Id. at 202. As to judicial economy and convenience, the evidence Hopkins has obtained through discovery can certainly still be used if he decides to refile his action. See id. at 203. The dismissal is not unfair because Hopkins bore the risk of subjecting his 11 state-law claims to the Court's discretionary supplemental jurisdiction power in a case where diversity of citizenship did not exist. See id. Furthermore, under § 1367(d)'s tolling provision, there is no risk that Hopkins will be unable to refile his claims due to a state law statute of limitations.    Finally, comity favors permitting a New Jersey court to hear Hopkins's numerous state law claims. See id.

It is also worth noting that even if this Court had original jurisdiction over a claim in this action, the Court would be permitted to decline to exercise supplemental jurisdiction under § 1367(c)(2) if Hopkins's supplemental claims "substantially predominate[] over the claim or claims over which the district court has original jurisdiction." Hopkins' 11 state law claims certainly predominate over his lone ERISA claim, which, as explained above, Hopkins had no standing to assert against Nightingale. See, e.g., Angstadt v. Midd-West Sch. Dist., 377 F.3d 338, 340 & n.1, 345 (3d Cir. 2004) (affirming district court's refusal to exercise jurisdiction over pendent state law claims under § 1367(c)(2)).

In sum, the Court declines to exercise supplemental jurisdiction over Hopkins's state law claims under § 1367(c).  Furthermore, the Court also declines to exercise supplemental jurisdiction over Defendants' counterclaims against Hopkins, and Third Party Complaint against SHA, which exclusively assert state law claims.

**III.    <u>Conclusion</u>**

For the foregoing reasons, Defendants' motion for summary judgment on Plaintiff's ERISA claim will be granted, and the balance of the case will be dismissed without prejudice for lack of federal subject-matter jurisdiction.


<u>/s/ John C. Lifland, U.S.D.J.</u>


November 21, 2006